1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

PEARL N. R.,[1]

                Plaintiff,

      v.

KILOLO KIJAKAZI, Acting
Commissioner of Social Security,

            Defendant.

Case No. 2:21-cv-05001-JC

MEMORANDUM OPINION

I.    **SUMMARY**

       On June 18, 2021, plaintiff filed a Complaint seeking review of the
Commissioner of Social Security's denial of plaintiff's application for benefits.
The parties have consented to proceed before the undersigned United States
Magistrate Judge.

       This matter is before the Court on the parties' cross motions for summary
judgment, respectively ("Plaintiff's Motion") and ("Defendant's Motion")
(collectively "Motions").  The Court has taken the Motions under submission

---

      [1]Plaintiff's name is partially redacted to protect her privacy in compliance with Federal
Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court
Administration and Case Management of the Judicial Conference of the United States.

1

1  without oral argument.  See Fed. R. Civ. P. 78; L.R. 7-15; June 28, 2021 Case

2  Management Order ¶ 5.

3       Based on the record as a whole and the applicable law, the decision of the

4  Commissioner is AFFIRMED.  The findings of the Administrative Law Judge

5  ("ALJ") are supported by substantial evidence and are free from material error.

6  **II.   BACKGROUND AND SUMMARY OF ADMINISTRATIVE**

7         **DECISION**

8       In September 2018, plaintiff filed applications for Supplemental Security

9  Income and Disability Insurance Benefits, alleging disability beginning on

10  January 1, 2018, due to diabetes, fibromyalgia, congestive heart failure, a learning

11  disability, anxiety, depression, and high blood pressure.  (Administrative Record

12  ("AR") 197-208, 224-25).  The ALJ examined the medical record and heard

13  testimony from plaintiff (who was represented by counsel) and a vocational expert.

14  (AR 31-53).

15      On November 25, 2020, the ALJ determined that plaintiff was not disabled

16  through the date of the decision.  (AR 13-25).  Specifically, the ALJ found:

17  (1) plaintiff suffered from the following severe impairments:  coronary artery

18  disease with prior myocardial infarction and stenting, shoulder impingement

19  syndrome, bilateral carpal tunnel syndrome, rheumatoid arthritis, fibromyalgia,

20  diabetes mellitus, hypertension, hypercholesterolemia, hyperlipidemia, obesity,

21  major depressive disorder, mood disorder, cognitive disorder, and borderline

22  intellectual functioning (AR 16); (2) plaintiff's impairments, considered

23  individually or in combination, did not meet or medically equal a listed impairment

24  (AR 17-18 (expressly considering Listings 12.02, 12.04, and 12.11)); (3) plaintiff

25  retained the residual functional capacity to perform light work (20 C.F.R.

26  ///

27  ///

28  ///

1    §§ 404.1567(b), 416.967 (b)) with additional limitations[2] (AR 18-23); (4) plaintiff
2    could not perform any past relevant work (AR 23); and (5) there are jobs that exist
3    in significant numbers in the national economy that plaintiff could perform (AR
4    24-25 (adopting vocational expert testimony at AR 46-51)).
5         On April 22, 2021, the Appeals Council denied plaintiff's application for
6    review.  (AR 1-3).
7    **III.    APPLICABLE LEGAL STANDARDS**
8         **A.    Administrative Evaluation of Disability Claims**
9         To qualify for disability benefits, a claimant must show that she is unable "to
10   engage in any substantial gainful activity by reason of any medically determinable
11   physical or mental impairment which can be expected to result in death or which
12   has lasted or can be expected to last for a continuous period of not less than
13   12 months." Molina v. Astrue, 674 F.3d 1104, 1110 (9th Cir. 2012) (quoting
14   42 U.S.C. § 423(d)(1)(A)) (internal quotation marks omitted), superseded by
15   regulation on other grounds as stated in Sisk v. Saul, 820 Fed. App'x 604, 606 (9th
16   Cir. 2020); 20 C.F.R. §§ 404.1505(a), 416.905(a).  To be considered disabled, a
17   claimant must have an impairment of such severity that she is incapable of
18   performing work the claimant previously performed ("past relevant work") as well
19   as any other "work which exists in the national economy." Tackett v. Apfel, 180
20   F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)).

21

22   _____

[2]The ALJ determined that plaintiff:  (1) could frequently use her upper extremities for
23   pushing and pulling; (2) could occasionally balance, stoop, kneel, crouch, crawl, bend, and climb
     ramps and stairs, but never climb ladders, ropes or scaffolds; (3) could frequently overhead
24   reach, handle, and finger; (4) must avoid concentrated exposure to extreme cold, heat, humidity,
     vibration, fumes, odors, dusts, gases, and poor ventilation; (5) could not work around
25   unprotected heights, with hazardous machinery, or on uneven terrain; (6) could understand,
     remember, and carry out simple job instructions; (7) could maintain attention and concentration
26   to perform simple, routine, and repetitive tasks; (8) could occasionally interact with coworkers
     and supervisors, but could not have contact with the general public; and (9) could work in an
27   environment with occasional changes to the work setting and occasional work-related decision
     making.  (AR 18).
28

3

1    To assess whether a claimant is disabled, an ALJ is required to use the five-
2    step sequential evaluation process set forth in Social Security regulations.  See
3    Stout v. Commissioner, Social Security Administration, 454 F.3d 1050, 1052 (9th
4    Cir. 2006) (describing five-step sequential evaluation process) (citing 20 C.F.R.
5    §§ 404.1520, 416.920).  The claimant has the burden of proof at steps one through
6    four – i.e., determination of whether the claimant was engaging in substantial
7    gainful activity (step 1), has a sufficiently severe impairment (step 2), has an
8    impairment or combination of impairments that meets or medically equals one of
9    the conditions listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings")
10   (step 3), and retains the residual functional capacity to perform past relevant work
11   (step 4).  Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (citation omitted).
12   The Commissioner has the burden of proof at step five – i.e., establishing that the
13   claimant could perform other work in the national economy.  Id.

14   **B.    Federal Court Review of Social Security Disability Decisions**

15   A federal court may set aside a denial of benefits only when the
16   Commissioner's "final decision" was "based on legal error or not supported by
17   substantial evidence in the record."  42 U.S.C. § 405(g); Trevizo v. Berryhill, 871
18   F.3d 664, 674 (9th Cir. 2017) (citation and quotation marks omitted).  The standard
19   of review in disability cases is "highly deferential."  Rounds v. Commissioner of
20   Social Security Administration, 807 F.3d 996, 1002 (9th Cir. 2015) (citation and
21   quotation marks omitted).  Thus, an ALJ's decision must be upheld if the evidence
22   could reasonably support either affirming or reversing the decision.  Trevizo, 871
23   F.3d at 674-75 (citations omitted).  Even when an ALJ's decision contains error, it
24   must be affirmed if the error was harmless.  See Treichler v. Commissioner of
25   Social Security Administration, 775 F.3d 1090, 1099 (9th Cir. 2014) (ALJ error
26   harmless if (1) inconsequential to the ultimate nondisability determination; or
27   (2) ALJ's path may reasonably be discerned despite the error) (citation and
28   quotation marks omitted).

1    Substantial evidence is "such relevant evidence as a reasonable mind might
2    accept as adequate to support a conclusion." Trevizo, 871 F.3d at 674 (defining
3    "substantial evidence" as "more than a mere scintilla, but less than a
4    preponderance") (citation and quotation marks omitted).  When determining
5    whether substantial evidence supports an ALJ's finding, a court "must consider the
6    entire record as a whole, weighing both the evidence that supports and the evidence
7    that detracts from the Commissioner's conclusion[.]" Garrison v. Colvin, 759 F.3d
8    995, 1009 (9th Cir. 2014) (citation and quotation marks omitted).

9    Federal courts review only the reasoning the ALJ provided, and may not
10   affirm the ALJ's decision "on a ground upon which [the ALJ] did not rely."
11   Trevizo, 871 F.3d at 675 (citations omitted).  Hence, while an ALJ's decision need
12   not be drafted with "ideal clarity," it must, at a minimum, set forth the ALJ's
13   reasoning "in a way that allows for meaningful review." Brown-Hunter v. Colvin,
14   806 F.3d 487, 492 (9th Cir. 2015) (citing Treichler, 775 F.3d at 1099).

15   A reviewing court may not conclude that an error was harmless based on
16   independent findings gleaned from the administrative record. Brown-Hunter, 806
17   F.3d at 492 (citations omitted).  When a reviewing court cannot confidently
18   conclude that an error was harmless, a remand for additional investigation or
19   explanation is generally appropriate. See Marsh v. Colvin, 792 F.3d 1170, 1173
20   (9th Cir. 2015) (citations omitted).

21   **IV.  DISCUSSION**

22   Plaintiff contends that the ALJ erred in considering the opinion of
23   consultative psychological examiner Dr. Rashin D'Angelo, and in evaluating
24   whether her mental impairment met or equaled Listing 12.05(B). See Plaintiff's
25   Motion at 2-8.  For the reasons discussed below, the Court finds no material error.
26   ///
27   ///
28   ///

5

A.     **Summary of the Relevant Medical Record**

1.     **Medical Records**

The record contains very few regular treatment notes for plaintiff's alleged mental impairments.[3]  Plaintiff treated monthly with psychiatrist Dr. Jun Yang from September 2018 through at least August 2020.  (AR 451-57, 570-85).  Dr. Yang prepared a psychiatry evaluation dated September 21, 2018, upon referral from plaintiff's family physician.  (AR 455-57).  Plaintiff reportedly had been depressed and anxious for three years following a heart attack and stroke in 2015. (AR 455).  Plaintiff developed "worrying a lot," fatigue, sleep disturbance (sleeping two hours per night), decreased memory and concentration, anhedonia, isolation, withdrawal, auditory hallucinations ("on/off"), suicidal ideation ("on/off") without plan, loss of interest in activities, and loss of sexual desire.  (AR 455).  She then was taking Bupropion XL (Wellbutrin) and Lexapro.  (AR 455; see also AR 432 (August, 2018 treatment note from Dr. Tarek Nassif noting depression, "MDD" (major depressive disorder) and Wellbutrin)).  Plaintiff reported that she lived with her mother, was single, and had a 17 year old son, completed the 11th grade, and used marijuana daily for five years.  (AR 455-56).

On mental status examination, plaintiff had psychomotor retardation, was tense and defensive with slow speech, depressed/anxious mood, restricted affect, distractible attention, poor concentration, fair memory, normal thought process, logical thought content, fair judgment and insight, and good-to-fair impulse control. (AR 456).  Dr. Yang increased plaintiff's Wellbutrin and Lexapro and added Trazodone.  (AR 457).

///

_____

[3]Since the issues plaintiff raises herein concern only plaintiff's mental impairments, limitations and abilities, the Court has not summarized the evidence concerning plaintiff's physical impairments.  Having said that, some of the handwriting in the medical records is difficult to read so the Court has presented its best interpretation of the evidence herein.

1    Plaintiff returned to Dr. Yang in December 2018, reporting that she was not

2    feeling better and the medications had not been helpful.  (AR 454).  She was

3    angry/irritable, her sleep had improved, and she had anxiety, depression, lassitude,

4    lack of focus, auditory and visual hallucinations every day, and paranoia.  (AR

5    454).[4]  She was "inconsistent" with medication compliance, and her treatment

6    progress was "unsatisfactory."  (AR 454).  Dr. Yang described plaintiff as

7    "unstable" with a diagnosis code of "F06.31" (indicating mood disorder due to

8    known physiological condition with depressive features), and changed plaintiff's

9    medications to Wellbutrin, Lexapro, and Seroquel.  (AR 454).[5]

10   Plaintiff returned in January 2019, reporting she was sleeping well but she

11   was isolated/withdrawn, had anxiety, depression, and lassitude with daily auditory

12   hallucinations, "on/off" visual hallucinations, and paranoia.  (AR 453).  She was

13   compliant with her medications but her progress again was unsatisfactory and her

14   condition had not improved, so Dr. Yang increased plaintiff's Seroquel dose and

15   continued her use of Wellbutrin and Lexapro.  (AR 453).

16   Plaintiff returned in February 2019, reporting she was off her medications

17   for one month and was easily angered, her sleep had improved to nine hours per

18   night, but she still had anxiety, depression, daily auditory and visual hallucinations,

19   paranoia, mood swings, withdrawal, and flashbacks.  (AR 452).  She was

20   inconsistent with medication compliance, her treatment progress remained

21   unsatisfactory, and she had not improved, so Dr. Yang continued her medications.

22   (AR 452).

23

24        [4]Dr. Yang's notes appear to use a circle with a plus sign for a positive finding, and a circle with a slash through it for a negative finding.  See, e.g., AR 454 (suggesting positive

25   anxiety, depression, and lassitude, and negative suicidal thought and mood swings).  If these symbols, which are a sometimes difficult to read, indicate the presence of the condition noted

26   (and not the absence), it would not change the Court's analysis herein.

27

28        [5]See https://www.icd10data.com/ICD10CM/Codes/F01-F99/F01-F09/F06-/F06.31 (last visited Aug. 12, 2022).

7

Plaintiff returned in March 2019, reporting that she had increased anger and daily agitation, her medications were not helping, her sleep had improved to 10 hours per night, her appetite was poor, she was having flashbacks, anxiety, daily auditory and visual hallucinations, and mood swings. (AR 451). She was compliant with her medications but her progress was unsatisfactory and she was unstable. (AR 451). Dr. Yang made a note to rule out "F43.10" (indicating post traumatic stress disorder ("PTSD")), and continued plaintiff's use of Wellbutrin and Lexapro, increased plaintiff's use of Seroquel, and added Prazosin. (AR 451).[6]

Plaintiff returned in April 2019, reporting decreased anger, daily nightmares and flashbacks, improved sleep, decreased anxiety, depression, lassitude, auditory hallucinations, mild paranoia, and mood swings despite taking her medications as directed. (AR 585). Her progress was unsatisfactory, but her condition had improved. (AR 585). Dr. Yang adjusted plaintiff's medications. (AR 585).

Plaintiff returned in May 2019, reporting that she was feeling a little better and the medications were helping, her sleep had improved, but she had anxiety, "on/off" depression, mild lassitude, no nightmares, auditory hallucinations, "on/off" paranoia, and mood swings. (AR 584). She was taking medications as directed, again her progress was unsatisfactory, but her condition had improved. (AR 584). Dr. Yang again adjusted plaintiff's medications. (AR 584).

Plaintiff returned in June 2019, reporting that she was not feeling better, the medications were not helping, she was having nightmares every night and sleeping three to four hours per night, she was isolated/withdrawn, and she had anxiety, depression, paranoia, anger, and mood swings. (AR 583). She was taking medications as directed, her progress was unsatisfactory, and her condition was "unstable." (AR 583). Dr. Yang diagnosed PTSD and adjusted plaintiff's medications. (AR 583).

---

[6]See https://www.icd10data.com/ICD10CM/Codes/F01-F99/F40-F48/F43-/F43.10 (last visited Aug. 12, 2022).

Plaintiff returned in July 2019, reporting that she was irritable, she could not sleep well, and she had anxiety, depression, lassitude, daily auditory hallucinations, "on/off" visual hallucinations, paranoia, and unstable mood swings.  (AR 583). She was taking medications as directed, her progress was unsatisfactory, and her condition was unstable.  (AR 582).  Dr. Yang directed plaintiff to find a new therapist and adjusted her medications.  (AR 582).

Plaintiff returned in August 2019, reporting that she was feeling better and the medications were helping, but she had irritability/anger, improved sleep, anxiety, mild depression, lassitude, daily auditory hallucinations, mood swings, and flashbacks.  (AR 581).  She was taking medications as directed, her progress was unsatisfactory, but her condition had improved.  (AR 581).  Dr. Yang continued plaintiff's medications.  (AR 581).

Plaintiff returned later in August  2019, reporting that she was not feeling better and the medications were not helping, she had increased irritability and would get upset easily, her sleep had improved, but she had anxiety, depression, lassitude, daily auditory and visual hallucinations, nightmares daily, flashbacks, and mood swings.  (AR 580).  She was taking medications as directed, her progress was unsatisfactory, and her condition was unstable.  (AR 580).  Dr. Yang adjusted plaintiff's medications.  (AR 580).

Plaintiff returned in September 2019, reporting that she was having daily nightmares and flashbacks, increased worry, improved sleep, anxiety, depression, lassitude, daily auditory hallucinations, "on/off" visual hallucinations, and mood swings.  (AR 579).  She was taking medications as directed, her progress was unsatisfactory, and her condition had not improved.  (AR 579).  Dr. Yang adjusted plaintiff's medications.  (AR 579).

Plaintiff returned in October 2019, reporting that she had anger and "on/off" upset, improved sleep, reduced anxiety, reduced depression, reduced auditory hallucinations every other day, daily nightmares, flashbacks, and mood swings.

(AR 578).  She was taking medications as directed, her progress was unsatisfactory, but her condition had improved.  (AR 578).  Dr. Yang gave plaintiff a sample of Trintellix.  (AR 578).

Plaintiff returned in November 2019, reporting that she had anger, anxiety, depression, lassitude, auditory hallucinations, "on/off" visual hallucinations, nightmares, flashbacks, and mood swings.  (AR 577).  She was taking medications as directed, her progress was unsatisfactory, and her condition was unstable.  (AR 577).  Dr. Yang adjusted plaintiff's medications.  (AR 577).

Plaintiff returned in December 2019, reporting that she had increased agitation, her mother-in-law had passed away, she had poor sleep, anxiety, increased depression, lassitude, auditory and visual hallucinations, nightmares, flashbacks, paranoia, and mood swings.  (AR 576).  She was taking medications as directed, her progress was unsatisfactory, and her condition was unstable.  (AR 576).  Dr. Yang added Seroquel to plaintiff's medications.  (AR 576).

Plaintiff returned in February 2020, reporting that her sleep had improved but she had isolation, "on/off" depression, reduced lassitude, auditory hallucinations, occasional paranoia, and reduced mood swings.  (AR 575).  She was taking medications as directed, her progress was satisfactory, and her condition had improved.  (AR 575).  Dr. Yang continued plaintiff's medications.  (AR 575).

Plaintiff returned in April 2020, reporting that she was feeling better and the medications were helping, her sleep had improved, but she had "on/off" depression, reduced lassitude, occasional auditory hallucinations, reduced paranoia, and reduced mood swings.  (AR 574).  She was taking medications as directed, her progress was satisfactory, and again her condition had improved.  (AR 574).  Dr. Yang continued plaintiff's medications.  (AR 574).

Plaintiff returned in May 2020, reporting that her sleep was better, but she had "on/off" depression, reduced lassitude, occasional auditory hallucinations,

occasional paranoia, and reduced mood swings.  (AR 573).  She was taking medications as directed, and her progress was satisfactory.  (AR 573).  Dr. Yang continued plaintiff's medications.  (AR 573).

Plaintiff returned in June 2020, reporting that she was not feeling better and the medications were not helping, she did not get Prazosin that month, her sleep was poor, she had anxiety, depression, lassitude, nightmares, auditory hallucinations, paranoia, and unstable mood swings.  (AR 572).  She reportedly was taking medications as directed (despite missing Prazosin), her progress was unsatisfactory, and her condition was unstable.  (AR 572).  Dr. Yang continued plaintiff's medications.  (AR 572).

Plaintiff returned in July 2020, reporting that she was sleeping two to three hours a night, and had anxiety, "on/off" depression, lassitude, auditory and visual hallucinations, nightmares, paranoia, and unstable mood swings.  (AR 571).  She was taking medications as directed, and her progress was unsatisfactory.  (AR 571).  Dr. Yang added Trazodone to plaintiff's medications.  (AR 571).

Plaintiff returned in August 2020, reporting that she was angry/upset, her sleep had improved, her anxiety had reduced, her depression had reduced, and she had lassitude, daily auditory hallucinations, "on/off" visual hallucinations, and mood swings.  (AR 570).  She was taking medications as directed, her progress was unsatisfactory, but her condition had improved.  (AR 570).  Dr. Yang adjusted plaintiff's medications.  (AR 570).

## 2.    Opinion Evidence

Consultative examiner Dr. D'Angelo prepared a Complete Mental Status Examination by Psychologist for plaintiff dated January 4, 2019.  (AR 445-49).  Dr. D'Angelo notedly had reviewed an "adult disability report" (see AR 233-31 (possibly what Dr. D'Angelo described)) and Dr. Yang's September 21, 2018

///

///

11

1  psychiatric evaluation (see AR 455-57).  (AR 445).[7]  Plaintiff complained of

2  depression, hearing whispers, seeing things, mood swings, lack of sleep, difficulty

3  being around crowds, insomnia, fatigue, social withdrawal, trouble concentrating,

4  memory problems due to medication, chronic pain related to fibromyalgia.  (AR

5  445-46).  Plaintiff's symptoms reportedly began in 2015 after she suffered a heart

6  attack, for which Dr. Yang had prescribed Wellbutrin XL, Trazodone, and

7  Lexapro.  (AR 446).

8      Plaintiff reported a history of alcohol and ecstasy use but had been sober

9  since 2014.  (AR 446).  She was living in an apartment with her husband/domestic

10  partner and roommate, and reported okay relationships with her family.  (AR 446-

11  47).  She had a 17 year old son.  (AR 446).  She completed 11th grade and had

12  special education classes.  (AR 446).  She last worked as a home care provider in

13  2012, and stopped working due to difficulty dealing with people.  (AR 446).  She

14  reportedly was unable to do household chores, cook, run errands, or grocery shop,

15  and did not drive but she could take public transportation.  (AR 447).  She had

16  adequate self-care skills.  (AR 447).

17      On mental status examination, plaintiff was slightly unkempt, had a distant

18  and somewhat cooperative manner with poor eye contact and difficulty

19  establishing rapport, minimal, soft, slow speech, depressed mood, and flat affect.

20  (AR 447).  Plaintiff reported hearing whispers and seeing people follow her, but

21  there was no clinical presentation of psychosis.  (AR 447).  Plaintiff had immediate

22  recall of one out of three words, delayed recall of zero out of three words, she was

23  unable to do serial threes or sevens, and unable to spell "world" forward or

24  backward.  (AR 447).  She was unable to state the similarities between an apple

25  and an orange, and unable to analyze the meaning of simple proverbs.  (AR 447).

26  She was unable to name the current and past president or the capital of California

27

28

[7]It is unclear whether Dr. D'Angelo reviewed any more of the medical record.

12

1   or the United States.  (AR 448).  She did have common sense understandings and
2   responded appropriately to imaginary situations requiring social judgment and
3   knowledge of norms.  (AR 448).

4          Dr. D'Angelo diagnosed a mood disorder due to a known physiological
5   condition, cognitive disorder due to a known physiological condition, and heart
6   failure.  (AR 448 (explaining that the mood disorder and cognitive disorder were
7   due to heart attack)).  Dr. D'Angelo observed:

8                 Claimant reported having auditory hallucinations and paranoia,
9          however she did not seem to be exhibiting psychosis and may have
10         been exaggerating some of her symptomology.  Her symptoms seem
11         to fit more of a mood disorder as a result of a heart attack, along with
12         cognitive impairment including memory loss and concentration
13         difficulties.  She seems to need assistance with daily care due to
14         physical issues and mobility impairment.
15  (AR 448) (emphasis added).  Dr. D'Angelo assessed moderate to marked
16  limitations:

17                The claimant exhibits mild difficulty interacting with the clinic
18         staff or myself.  She has mild difficulty maintaining composure and
19         even temperament.  She has moderate difficulties maintaining social
20         functioning.  She has moderate difficulty with maintaining focus and
21         attention.  She has marked difficulties in concentration, persistence
22         and pace.  The level of personal independence is poor.  She is
23         intellectually and psychologically capable of performing activities of
24         daily living. . . .

25                Based on the objective findings presented during this interview,
26         the claimant would be able to understand,  remember and carry out
27         short, simplistic instructions with moderate difficulty.  She also would
28         have marked difficulty to understand, remember and carry out detailed

13

1    and complex instructions.  She would have moderate difficulty to
2    make simplistic work-related decisions without special supervision.
3    She would have marked difficulty to comply with job rules such as
4    safety and attendance.  She would have marked difficulty to respond
5    to change in a normal workplace setting.  She would have marked
6    difficulty to maintain persistence and pace in a normal workplace
7    setting.  She would have marked difficulty handling the usual stresses,
8    changes and demands of gainful employment.

9         The claimant presents with marked difficulty to interact
10   appropriately with supervisors, coworkers and peers on a consistent
11   basis.

12   (AR 448).  Plaintiff's prognosis was guarded.  (AR 449).

13        A state agency psychologist reviewed the record initially in January 2019,
14   which included some treatment notes from Dr. Yang and Dr. D'Angelo's opinion,
15   and found non-severe medically determinable impairments of Depressive, Bipolar
16   and Related Disorders, and Anxiety and Obsessive-Compulsive Disorders.  (AR
17   54-63, 71-79).  The psychologist considered corresponding Listings 12.04 and
18   12.06 and found only mild limitations in the paragraph B criteria (*i.e.*,
19   (1) understanding, remembering, or applying information; (2) interacting with
20   others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or
21   managing oneself).  See AR 63-64, 67, 79-80, 83 (finding Dr. D'Angelo's opinion
22   without substantial support from Dr. D'Angelo's examination, and an overestimate
23   of plaintiff's restrictions/limitations).  The state agency reviewers found plaintiff
24   capable of light work with no mental limitations. (AR 65-66, 82).

25        Consultative examiner Dr. Allen Sung prepared a Complete Psychological
26   Evaluation dated June 10, 2019.  (AR 458-63).  Dr. Sung reviewed no medical
27   records.  (AR 459).  Plaintiff was a below average historian, so plaintiff's mother
28   (who had accompanied plaintiff to the examination) provided supplemental

14

historical information.  (AR 458).  Plaintiff complained of feeling agitated, irritated, and angry for years, she did not like to go out in public or be around people, she had a problem with alcohol and ecstasy in the past, she experienced occasional passive suicidal thoughts (but no plan), auditory and visual hallucinations, and she currently was seeing a psychiatrist and a therapist but it was "not helping much."  (AR 458-59).  Plaintiff reported no psychiatric hospitalizations.  (AR 459).

Plaintiff reportedly was single, lived with her mother, and did not get along well with her friends or family.  (AR 459-60).  She had completed the 11th grade with below average grades, attending special education classes from 7th through 11th grades.  (AR 459).  She last worked years before but could not remember what her job was.  (AR 460).  She started using alcohol at age 14, abused ecstacy from age 17 to age 30, and had never been in a treatment program.  (AR 460).  She was arrested once for fraud and spent one day in jail.  (AR 460).

On a typical day, plaintiff reportedly "[did] nothing," and experienced difficulty getting along with friends and family, but she could independently dress, bathe, complete household chores, shop, make simple meals, and manage her funds.  (AR 460).  Plaintiff had never had a driver's license and her mother was supporting her financially.  (AR 460).

On mental status examination, plaintiff was quietly agitated and upset (described as "irritated, angry, and nervous") with blunted affect, appropriate eye contact, she appeared to put forth adequate effort on testing, her speech and language were within normal limits, her thoughts were coherent and logical and content was appropriate, but her intellectual functioning was in the borderline range. (AR 460-61).  She reported auditory and visual hallucinations, however, no signs of perceptual disturbance were noted during the examination, nor was bizarreness or confusion evident.  (AR 461).  Her memory was intact, her attention and concentration were adequate, she had a poor fund of knowledge, and poor

1   insight and judgment.  (AR 461-62).  Dr. Sung tested plaintiff's intelligence and

2   memory; her full scale IQ was borderline at 70, and her memory was in the

3   borderline range.  (AR 461-62 (Wechsler Intelligence and Memory testing)).

4        Dr. Sung diagnosed, *inter alia*, "probable" major depressive disorder and

5   borderline intellectual functioning.  (AR 462).  Dr. Sung opined that plaintiff

6   would have none-to-mild limitations, *i.e.,* plaintiff:  (1) would have no difficulty in

7   understanding, remembering and carrying out short, simplistic instructions, making

8   simplistic work-related decisions without special supervision, and responding to

9   change in a normal workplace setting; and (2) would have mild difficulty in

10  understanding, remembering and carrying out detailed and complex instructions,

11  complying with job rules such as safety and attendance, maintaining persistence

12  and pace in a normal workplace setting, and interacting appropriately with

13  supervisors, coworkers and peers on a consistent basis.  (AR 462-63 (noting that

14  plaintiff had a history of interpersonal difficulties and was mildly socially

15  inappropriate on examination)).

16       On reconsideration in July 2019, a state agency psychologist reviewed

17  updated records from Dr. Yang, as well as Dr. D'Angelo's and Dr. Sung's

18  opinions, and found severe medically determinable impairments of Depressive,

19  Bipolar and Related Disorders, Neurocognitive Disorders, and Borderline

20  Intellectual Functioning.  (AR 89-95, 108-14).  The psychologist considered

21  Listings 12.02, 12.04, and 12.11, and found only moderate limitations in the

22  paragraph B criteria.  <u>See</u> AR 96-99, 102-04, 115-18, 121-23 (again finding that

23  Dr. D'Angelo's opinion appeared to overstate the symptom severity, and finding

24  that Dr. Sung's opinion appeared "underrestrictive" based on the objective

25  evidence).  The psychologist opined that plaintiff would have a mental residual

26  functional capacity with moderate limitations in various areas, but plaintiff should

27  be able to:  (1) work where there is relatively low interpersonal contact (*e.g.*, low

28  contact with the public and working alone or with limited contact with coworkers

1 and supervisors); (2) understand, remember and carry out simple (1-2 step)

2 instructions, maintaining attention and concentration for two hour blocks; (3) make

3 simple judgments and work-related decisions; (4) respond appropriately to

4 supervision, coworkers, and work situations; and (5) deal with changes in a routine

5 work setting.  (AR 101-03, 120-23).

6        **B.      The ALJ Properly Considered Dr. D'Angelo's Opinion**

7        Plaintiff contends that the ALJ did not properly consider Dr. D'Angelo's

8 opinion in that the ALJ failed to provide any specific and legitimate reasons for

9 rejecting Dr. D'Angelo's opinion.  See Plaintiff's Motion at 2-5 (citing, *inter alia*,

10 Hill v. Astrue, 698 F.3d 1153, 1159-60 (9th Cir. 2012) (discussing treating/

11 examining physician rule)).  Contrary to plaintiff's argument, the ALJ followed the

12 applicable regulations.

13        For claims filed after March 27, 2017 (such as plaintiff's present claims),

14 new regulations govern the evaluation of medical opinion evidence.  Under these

15 regulations, ALJs no longer "weigh" medical opinions; rather, ALJs determine

16 which opinions are the most "persuasive" by focusing on several factors:

17 (1) supportability; (2) consistency; (3) relationship with the claimant (including the

18 length of treatment, frequency of examinations, purpose of treatment, extent of

19 treatment, whether the medical source examined the claimant); (4) the medical

20 source's specialty; and (5) "other" factors.  See 20 C.F.R. §§ 404.1520c(c)(1)-(5),

21 416.920c(c)(1)-(5).  The two most important factors in determining the

22 persuasiveness of medical opinions are supportability and consistency with the

23 evidence.  See 20 C.F.R. §§ 404.1520c(a), 416.920c(a).  ALJs must explain how

24 they considered the factors of supportability and consistency, but need not explain

25 how they considered any other factor.  See 20 C.F.R. §§ 404.1520c(b),

26 416.920c(b).

27        Supportability means the extent to which a medical source supports

28        the medical opinion by explaining the "relevant. . . objective medical

17

1  evidence."  Consistency means the extent to which a medical opinion

2  is "consistent. . . with the evidence from other medical sources and

3  nonmedical sources in the claim.

4  Woods v. Kijakazi, 32 F.4th 785, 791-92 (9th Cir. 2022) (internal citations

5  omitted; citing 20 C.F.R. § 404.1520c(c)(1), (2)).

6      The new regulations also eliminated the term "treating source," as well as

7  the rule previously known as the treating source rule or treating physician rule,

8  which formerly required special deference to the opinions of treating sources.  See

9  20 C.F.R. §§ 404.1520c, 416.920c; Woods v. Kijakazi, 32 F.4th at 792 ("The

10  revised social security regulations are clearly irreconcilable with our caselaw

11  according special deference to the opinions of treating and examining physicians

12  on account of their relationship with the claimant.").  Even so, in evaluating

13  medical opinion evidence "under the new regulations, an ALJ cannot reject an

14  examining or treating doctor's opinion as unsupported or inconsistent without

15  providing an explanation supported by substantial evidence."  Woods v. Kijakazi,

16  32 F.4th at 792.  Finally, the new regulations command that an opinion

17  that a claimant is disabled or not able to work is "inherently neither valuable nor

18  persuasive," and an ALJ need not provide any analysis about how such evidence is

19  considered.  See 20 C.F.R. §§ 404.1520b(c)(3), 416.920b(c)(3).

20      Here, in determining plaintiff's mental residual functional capacity for work

21  limited to simple, routine repetitive tasks with occasional changes in the work

22  setting, occasional work-related decision making, occasional interaction with

23  coworkers and supervisors and no interaction with the public, the ALJ found

24  "persuasive" the state agency psychologist's opinion on reconsideration (over the

25  finding on initial review of no severe mental impairments at AR 63, 79).  (AR 18,

26  22).  The ALJ reasoned that the reconsideration review, which had found that

27  plaintiff would be able to understand, remember, and carry out simple work-related

28  tasks with relatively low interpersonal contact (see AR 103, 122), was consistent

1   with plaintiff's use of psychotropic medications and abnormal mental status

2   examinations.  (AR 22 (citing, *inter alia*, AR 432 (August 2018 primary care

3   doctor's note mentioning depression and treatment with Wellbutrin), AR 445-49

4   (Dr. D'Angelo's consultative report), AR 451-57, 579-85 (Dr. Yang's evaluation

5   and treatment notes), AR 458-63 (Dr. Sung's consultative report)).

6       The ALJ found "somewhat persuasive" Dr. Sung's June 10, 2019

7   psychological consultative examination finding no more than mild limitations,

8   reasoning that Dr. Sung had not reviewed plaintiff's medical records and only

9   examined plaintiff once, albeit with intellectual testing.  (AR 21-23 (citing AR

10  458-59 (portions of Dr. Sung's report)).

11      The ALJ found "not persuasive" Dr. D'Angelo's January 4, 2019

12  psychological consultative examination opining that plaintiff would have moderate

13  to marked limitations, reasoning that it was not supported by the medical record

14  which showed no clinical evidence of psychosis, no history of psychiatric

15  admissions despite plaintiff's claiming to have continuing, ongoing daily auditory

16  and visual hallucinations, and Dr. D'Angelo's own observation that plaintiff may

17  have been exaggerating her symptoms.  (AR 22 (citing AR 440-44 (internal

18  medicine evaluation), AR 448 (Dr. D'Angelo's medical source statement), and AR

19  461 (Dr. Sung's report noting no signs of perceptual disturbance)).  The ALJ also

20  asserted that, unlike the state agency psychologist on reconsideration, Dr.

21  D'Angelo did not have an opportunity to review plaintiff's medical file (including

22  Dr. Sung's consultation which came after Dr. D'Angelo's evaluation). (AR 22; but

23  see AR 445-46 (Dr. D'Angelo indicating review of Dr. Yang's September 21, 2018

24  psychiatric evaluation)).

25      As the foregoing demonstrates, the ALJ followed the new regulations,

26  making the relevant findings based on the available record in determining

27  plaintiff's mental residual functional capacity.  The Court discerns no error.

28  Moreover, substantial evidence supports the ALJ's reasoning and conclusions

1   including those concerning the supportability and consistency of Dr. D'Angelo's
2   opinion, which the Court observes appears to have been based largely on
3   interviewing plaintiff where Dr. D'Angelo noted that plaintiff may have been
4   exaggerating her symptoms.  See AR 445-49.  Finally, the state agency
5   psychologist's opinion on reconsideration review and Dr. Sung's opinion, which
6   found mental limitations arguably consistent with or lesser than the ALJ found to
7   exist, support the ALJ's mental residual functional capacity determination.  See
8   Thomas v. Barnhart, 278 F.3d 947, 967 (9th Cir. 2002) ("The opinions of non-
9   treating or non-examining physicians may. . . serve as substantial evidence when
10  the opinions are consistent with independent clinical findings or other evidence in
11  the record.").  While plaintiff may disagree with the residual functional capacity,
12  the Court must uphold the ALJ's rational interpretation of the evidence.  See Ford
13  v. Saul, 950 F.3d 1141, 1159 (9th Cir. 2020) ("Our review of an ALJ's fact-finding
14  for substantial evidence is deferential, and '[t]he threshold for such evidentiary
15  sufficiency is not high.'") (citation omitted).

16          The vocational expert testified that a person with the limitations the ALJ
17  found to exist could perform other work (AR 46-51).  The ALJ properly relied on
18  the vocational expert's testimony in denying disability benefits.  See Barker v.
19  Sec'y of Health and Human Servs., 882 F.2d 1474, 1478-80 (9th Cir. 1989);
20  Martinez v. Heckler, 807 F.2d 771, 774-75 (9th Cir. 1986).

21          **C.     The ALJ Did Not Materially Err in Finding That Plaintiff's**
22                  **Mental Impairments Do Not Meet or Equal Listing 12.05(B)**

23          Plaintiff contends that the ALJ erred in failing to find that she meets or
24  equals Listing 12.05(B) (intellectual disorder), a listing that plausibly applies to
25  plaintiff's case based in part on Dr. D'Angelo's opinion that she had moderate to
26  marked limitations.  See Plaintiff's Motion at 5-8.  The Court discerns no material
27  error.
28  ///

20

1    Plaintiff has the burden of demonstrating disability under the Listings.  See

2  Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122

3  (1996); Sullivan v. Zebley, 493 U.S. 521, 530-31 (1990) (burden is on the claimant

4  to show that his or her impairment meets all of the specified medical criteria for a

5  Listing, or present medical findings equal in severity to all the criteria for the most

6  similar listed impairment), superseded by statute on other grounds as stated in

7  Kennedy v. Colvin, 738 F.3d 1172, 1174 (9th Cir. 2013).  An impairment or

8  combination of impairments that manifests only some of the criteria, no matter how

9  severely, does not qualify.  Zebley, 493 U.S. at 530.

10    To be considered presumptively disabled under Listing 12.05(B) as plaintiff

11  now suggests, plaintiff must demonstrate:

12    (1)    significantly subaverage general intellectual functioning evidenced by

13           a full scale (or comparable) IQ score of 70 or below on an individually

14           administered standardized test of general intelligence;

15    (2)    significant deficits in adaptive functioning currently manifested by

16           extreme limitation of one, or marked limitation of two, of the

17           following areas of mental functioning (a) understanding,

18           remembering, or applying information; (b) interacting with others;

19           (c) concentrating, persisting, or maintaining pace; or (d) adapting or

20           managing oneself; and

21    (3)    evidence supports a conclusion that the disorder began prior to age 22.

22  (Listing 12.05(B) (emphasis added)).

23    Plaintiff did not suggest that she met a specific Listing at the administrative

24  hearing, or otherwise raise a specific Listings argument before the Administration.

25  (AR 31-53, 193-95).  Plaintiff, in arguing that she meets Listing 12.05(B) – which

26  she apparently asserted for the first time with this Court – fails to carry her burden

27  to demonstrate that she meets or equals that Listing.

28  ///

21

The ALJ expressly considered and found that plaintiff did not satisfy Listings 12.02 (neurocognitive disorders), 12.04 (depressive, bipolar and related disorders), and 12.11 (neurodevelopmental disorders), which (like Listing 12.05(B)(2)) include significant deficits in adaptive functioning.  See AR 17-18; see also Listings 12.02, 12.04, and 12.11.  The ALJ found only moderate limitations in each of the areas of adaptive functioning.  (AR 17).  The ALJ reasoned that:  (1) for understanding, remembering, and applying information, plaintiff had fair recent and remote memory on mental status examinations and psychometric testing showed borderline memory functioning (AR 17 (citing AR 447, 456, 462)); (2) for interacting with others, although plaintiff did not endorse social activities (see AR 239), her friend reported that she spends time daily with family and friends, and plaintiff maintained a romantic relationship (AR 17 (citing AR 260, 441, 445-46)); (3) for concentrating, persisting, and maintaining pace, plaintiff was unable to perform serial sevens or threes, or spell the word "world" forward and backward, and she reported ongoing hallucinations, but there was no evidence that she responded to internal stimuli (AR 17 (citing AR 447, 461)); and (4) for adapting and managing herself, although she reported difficulty with personal care (see AR 236), she also reported that she could perform household chores and make simple meals, and she was adequately groomed (AR 17-18 (citing AR 458, 460)).  Accordingly, if the ALJ's reasoning is sound, any failure by the ALJ to consider specifically Listing 12.05(B) is harmless, because plaintiff's limitations would not rise to the level needed for that Listing as well.

The record supports the ALJ's reasoning.  As detailed above, the ALJ found Dr. D'Angelo's opinion suggesting greater limitations not persuasive.  (AR 22). The state agency psychologist on initial review considered Listings 12.04 and 12.06 and found only mild limitations in the areas of adaptive functioning.  See AR 63-64, 67, 79-80, 83 (finding Dr. D'Angelo's consultative examiner opinion without substantial support and an overestimate of plaintiff's limitations).  On

reconsideration review, the state agency psychologist considered Listings 12.02, 12.04, and 12.11, and (consistent with the ALJ's findings) found only moderate limitations in each of the areas of adaptive functioning.  See AR 96-99, 102-04, 115-16, 118, 121-23 (also finding that Dr. D'Angelo's opinion appeared to overstate the symptom severity).

While plaintiff argues contrary interpretations of the record evidence, it was for the ALJ to interpret the evidence, determine credibility, and resolve any conflicts in the evidence.  See Brown-Hunter, 806 F.3d at 492 (citing Treichler, 775 F.3d at 1098); Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir. 2007) ("[I]f evidence is susceptible of more than one rational interpretation, the decision of the ALJ must be upheld.") (citation omitted).  The Court will uphold the ALJ's rational interpretation of the evidence notwithstanding any conflicts therein.  See Ford, 950 F.3d at 1159.  The evidence establishes that plaintiff does not meet or equal Listing 12.05(B) for the same reasons she did not meet Listings 12.02, 12.04 and 12.11.

**V.    CONCLUSION**

For the foregoing reasons, the decision of the Commissioner of Social Security is AFFIRMED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED:   August 12, 2022

_____
                              /s/
Honorable Jacqueline Chooljian
UNITED STATES MAGISTRATE JUDGE